**CABOT CORPORATION**

v.

**UNITED STATES of America.**

Civ. A. No. 62–589.

United States District Court
D. Massachusetts.

June 4, 1963.

H. Brian Holland, George T. Finnegan, Ropes & Gray, Boston, Mass., for plaintiff.

Rufus E. Stetson, U. S. Dept. of Justice, Washington, D. C., W. Arthur Garrity, Jr., U. S. Atty., Boston, Mass., for the United States.

WYZANSKI, District Judge.

This is a suit for refund of federal stock issue taxes paid by the plaintiff Cabot Corporation (Cabot) under Int. Rev.Code § 4301 with respect to the issuance of certain shares of its capital stock under the circumstances hereinafter stated. The defendant counterclaimed for additional federal stock issue taxes as well as for federal stock transfer taxes claimed to be due under Int.Rev.Code §§ 4301 and 4321, respectively, with respect to the issuance of shares of Cabot under the same circumstances.

With respect to both the claim and the counterclaim the single issue is whether Cabot, the taxpayer corporation, falls within the exemption afforded by Int.Rev. Act § 4382(b) (1) (D). If so, then Cabot is not liable for the original issue taxes under § 4301 (referred to in the claim and counterclaim), or for ·stock transfer taxes under § 4321 (referred to in the counterclaim).

The relevant statutory provisions follow:

Int.Rev.Code § 4301. Imposition of tax.

"There is hereby imposed, on each original issue of shares or certificates of stock issued by a corporation (whether on organization or reorganization), a tax at the rate of 10 cents on each $100 (or major fraction thereof) of the actual value of the certificates (or of the shares where no certificates are issued); except that such rate shall be 4 cents instead of 10 cents in the case of shares or certificates issued by a corporation to which subchapter M of chapter 1 applies for the taxable year during which such share or certificate is issued. The tax imposed by this section shall be computed on the basis of all certificates (or shares) so issued by the corporation on each day."

Int.Rev.Code § 4321. Imposition of tax.

"There is hereby imposed on each sale or transfer of shares or certificates of stock, or of rights to subscribe for or to receive such shares or certificates, issued by a corporation, a tax at the rate of 4 cents on each $100 (or major fraction thereof) of the actual value of the certificates, of the shares where no certificates are sold or transferred, or of the rights, as the case may be. In no case shall the tax so imposed on any such sale or transfer be—

"(1) more than 8 cents on each share, or

"(2) less than 4 cents on the sale or transfer."

Int.Rev.Code § 4382(b) (1) (D). Exemptions.

"(b) Certain reorganizations, etc. —The taxes imposed by sections 4301, 4311, 4321, 4331, and 4361 shall not apply to—

"(1) Corporate and railroad reorganization. — The issuance, transfer, or exchange of securities, or the making, delivery, or filing of conveyances, to make effective any plan or reorganization or adjustment—

\*     \*     \*     \*     \*.     \*

"(D) whereby a mere change in identity, form, or place of organization is effected, but only if the issuance, transfer, or exchange of securities, or the making, delivery, or filing of instruments of transfer or conveyances, occurs within 5 years from the date of such confirmation, approval, or change."

Put summarily, the question is whether "a mere change in identity, form, or place of organization" was effectuated when Cabot Corporation issued its stock to Godfrey L. Cabot, Inc. on September 30, 1960. The facts, as stipulated, follow.

As of 1960, Godfrey L. Cabot, Inc. (Godfrey), a Massachusetts corporation, owned all the issued and outstanding stock of Cabot Shops, Inc. (Shops) and Cabot Gasoline Corporation (Gas). Godfrey, Shops and Gas were all Massachusetts corporations. Godfrey also owned 58,759 of the 61,900 issued and outstanding shares of Cabot Carbon Company, another Massachusetts corporation. Of the remaining 3,141 shares of Carbon, 2,945 were owned by individuals who also owned 16,551 shares of Godfrey, and the remaining 196 were owned by others.

For some time prior to 1960 Godfrey's management had been generally considering a consolidation of the subsidiaries Carbon, Shops, and Gas into or with the parent Godfrey in Massachusetts. Commencing in February of 1960 Godfrey's management began making detailed plans for such merger or consolidation under either Massachusetts G.L. (Ter.Ed.) c. 156, § 46A (merger) or § 46B (consolidation), Godfrey remaining a Massachusetts corporation. The purposes of such a consolidation or merger in Massachusetts were to eliminate as between the parent and the subsidiaries increasingly complex problems of intercorporate accounting and financial and business relationships relating to expenses and management and royalty fees charged by the parent to the subsidiaries; to eliminate multiple bank accounts and intercorporate transfers of funds;

to reduce corporate meetings; to facilitate borrowing funds; to avoid the federal tax on intercorporate dividends; to eliminate what was believed to be an increasing danger that Godfrey would become a personal holding company; to eliminate changes in pension plans which burdened the interchange of employees; and to reduce the volume and expense of work with respect to tax returns and reports to federal and state agencies, accountings and audits, and business qualifications. There was, on the other hand, no continuing business reason to maintain the parent-subsidiary relationship.

In connection with this merger or consolidation it was also planned to change the name of Godfrey to Cabot Corporation, amend its purposes and by-laws, and split its stock to make it more generally acceptable. By mid-April of 1960 it was contemplated that this transaction would be effected on September 30, 1960. By mid-May it was still not decided whether to effect a § 46A merger or a § 46B consolidation under Massachusetts law, but Godfrey was to remain a Massachusetts corporation.

In early May of 1960 while the merger of the subsidiaries into Godfrey under Massachusetts law was being planned, Godfrey's Comptroller Department suggested that a reincorporation of Godfrey outside of Massachusetts would eliminate Massachusetts taxes on Godfrey's income from its wholly-owned subsidiaries in England, Canada, France, and Italy. Godfrey was receiving increasing amounts of income from these subsidiaries and it was expected that this income would continue to increase. It was contemplated that reincorporation in another state would probably save Godfrey approximately $200,000 a year in Massachusetts taxes. Such a change, however, raised certain problems concerning foreign license agreements, and it was not until the latter part of June of 1960 that these problems were resolved and the decision was made to reincorporate Godfrey outside of Massachusetts. The purpose of this reincorporation was to eliminate these Massachusetts taxes. In

selecting Delaware as the state of re-incorporation, weight was given to the clarity and flexibility of Delaware corporation law and low Delaware taxes on corporations.

The change of place of incorporation of Godfrey from Massachusetts to Delaware was not part of the original plan to merge the subsidiaries into Godfrey. Once the proposal to incorporate in Delaware was presented, however, it then became part of the discussions concerning the merger of the subsidiaries into the parent. Some thought was given to delaying the reincorporation in Delaware, but it was finally concluded to combine all of the transactions into one agreement, primarily to avoid duplication of effort, paper work and legal work.

On July 14, 1960 Cabot was accordingly incorporated under the laws of Delaware; and on September 6, 1960 Godfrey and the three domestic subsidiaries, Carbon, Shops, and Gas, entered into a merger agreement which provided for the merger of Godfrey and the three subsidiaries into Cabot as of September 30, 1960 pursuant to the provisions of § 252 of the General Corporation Law of the State of Delaware, 8 Del.C. § 252, and Massachusetts G.L. (Ter.Ed.) c. 156, § 46D. The merger agreement was consummated on September 30, 1960 and, in accordance with its terms, Cabot issued a total of 2,528,724 shares of its capital stock, of which 2,453,340 shares were issued in exchange for the 81,778 outstanding shares of Godfrey, and 75,384 shares were issued in exchange for the 3,141 shares of Carbon held by persons other than Godfrey. There was no dedication of any new capital. The remaining shares of Carbon stock and all of the outstanding shares of stock of Shops and Gas were cancelled and extinguished in accordance with the merger agreement. Thereafter Cabot continued to carry on the businesses formerly carried on by Godfrey and its three domestic subsidiaries.

In a letter dated May 9, 1961, addressed to Godfrey, the Internal Revenue Service ruled, among other things, that the merger of Godfrey into Cabot constituted a reorganization within the meaning of Int.Rev.Code, § 368(a) (1) (A) and (F), provided that all of the requirements of the statutes of Delaware and Massachusetts permitting such merger were met.

Upon the facts just recited the question presented is whether the 2,453,340 shares of Cabot issued in exchange for the outstanding shares of Godfrey were issued "to make effective any plan of reorganization or adjustment * * * whereby a mere change in identity, form, or place of organization is effected", within the meaning of Int.Rev.Code § 4382(b) (1) (D).

Before 1958 it had been held that stock issue and transfer taxes were payable with respect to the issuance and transfer of stock in a corporate reorganization even though the reorganization involved nothing more than reincorporation in another state, with no change in the rights or interests of stockholders other than might result from differences in the corporation laws of the two states. United States v. Vortex Cup Co., 84 F.2d 925 (7th Cir., 1936); American Gas Machine Co. v. Willcuts, 87 F.2d 924 (8th Cir., 1937); Jefferson Lake Sulphur Co. v. United States, 195 F.2d 1012 (5th Cir., 1952); American Mail Line, Ltd. v. United States, 101 F.Supp. 364, 121 Ct. Cl. 63 (1951).

Subparagraph (D) was added to § 4382(b) (1) by § 141(a) of the Excise Tax Technical Changes Act of 1958, P.L. 85–859, 72 Stat. 1275, 1302. Nothing in the language of the statute, or its legislative history, including the report of the Senate Finance Committee, Sen.Rep. No. 2090, 85th Cong., 2nd Sess., 1958, U.S.Code Congressional and Administrative News 1958, p. 4395, suggests that Congress had any intention to exempt a transaction which, to use the language of Helvering v. Southwest Consolidated Corp., 315 U.S. 194, 202–203, 62 S.Ct. 546, 551, 552, 86 L.Ed. 789, "shifts the ownership of the proprietary interest in a corporation." The Senate Report quite clearly states that sub-

paragraph D applies to "Reorganizations involving a mere change in identity, form, or place of organization [which] represent merely a formalistic change and do not involve any shifts in ownership."

In the instant case the reorganization was one series of interrelated steps all integrated in one document and accomplished without a discernible interval of time separating those steps for even a *scintilla juris*. A person who had held a chose-in-action in the form of stock in Godfrey acquired a chose-in-action in the form of stock in Cabot, and such change involved not merely such alteration in rights as might result from differences in the corporation laws of Delaware and Massachusetts, but also a change in his substantive interests or right because his percentage of stock of Cabot, the Delaware corporation, was not the same as his percentage of stock of Godfrey, the Massachusetts corporation. Such a shift in substantive rights of ownership does not fall within the exemption provided by subparagraph D.

It is no answer to the aforesaid conclusion that it might have been possible to proceed by two separate transactions —the first involving a mere reincorporation of Godfrey in Delaware, and the second a merger of the subsidiaries into the new Delaware corporation. Such procedural separation *might* have made the issuance of stock in connection with the first transaction exempt from taxation. But this case is not concerned with what might have been. For their own reasons, perhaps to achieve greater speed, perhaps to make other savings, those who planned the transaction of September 6, 1960 preferred integration to segregation.

It often happens that an integrated transaction involves tax consequences not applicable to segregated transactions. There may be an excise tax on each meal for which more than $1 is charged. If a lunch counter customer is deeply interested in avoidance of taxation he may order and pay for a main course for say 95 cents, leave momentarily, and return later and order and pay for coffee costing 10 cents, and thus avoid a tax. The same meal ordered and consumed by a taxpayer who prefers to be uninterrupted will involve him in a tax.

Nor can it validly be contended that it was the purpose of Congress to exempt such parts of an integrated transaction as could have been segregated into merely formal transfers. From the Senate report, the Congressional purpose appears to have been severely limited to a transaction that presented "merely a formalistic change" and was not interwoven with other changes.

Judgment to enter for the Government on both the complaint and counterclaim; computations to be submitted within one week by the parties.