**COLUMBIA GAS OF MARYLAND, INC. and Cumberland and Allegheny Gas Company**

v.

**The UNITED STATES.**

**No. 415–64.**

United States Court of Claims.

Oct. 14, 1966.

Rehearing Denied Dec. 16, 1966.

---

Edward S. Smith, Washington, D. C., for plaintiffs. John W. Avirett, II, Mathias J. De Vito, Baltimore, Md., William Anderson and Albert McBride, Jr., Pittsburgh, Pa., of counsel.

Knox Bemis, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, JONES, Senior Judge, and LARAMORE, DAVIS and COLLINS, Judges.

LARAMORE, Judge.

This case, now before us on cross-motions for summary judgment, presents an interesting question of the scope of the exemption for transactions incident to a corporate reorganization from the documentary stamp tax provisions of the Internal Revenue Code of 1954, 26 U.S.C. ch. 34, §§ 4301–4384 (1964 Ed.). Plaintiffs are wholly-owned subsidiaries of the Columbia Gas System, Inc., a Delaware corporation registered as a holding company under the Public Utility Holding Company Act of 1935, 49 Stat. 803. Plaintiff, Cumberland and Allegheny Gas Company (Cumberland), is a West Virginia corporation which prior to January 1, 1961, owned and operated natural gas transmission and distribution facilities in the states of West Virginia and Maryland. Its intrastate distribution operations were regulated by the public service commissions of the interested states. The interstate transmission activity was subject to the Federal Power Commission's jurisdiction. This regulatory situation was not ideal because the commissions used somewhat different rate-making formulas. The technical aspects of the interaction of the different formulas are not germane to this case; it is sufficient to say that Cumberland's management concluded that the rate structures of the West Virginia and Maryland gas distribution businesses would be more favorable if they were placed in separate corporate entities. To this end, Cumberland as a first step created the other plaintiff, Columbia Gas of Maryland, Inc., a Delaware corporation, on July 1, 1958. Four months later, on November 1, Columbia Gas System the parent, Cumberland the subsidiary, and Columbia Gas of Maryland the then sub-subsidiary shell corporation, agreed to "split-off" the gas distribution business in the state of Maryland by having Cumberland transfer to Columbia Gas of Maryland the tangible and intangible assets relating to that business. This took place on January 1, 1961. As an additional part of the agreement, and in consideration of the transfer of assets, Columbia Gas of Maryland issued 76,194 shares of $25 par capital stock, six percent demand notes, and installment promissory notes. This package of securities issued directly to Columbia Gas System and not to Cumberland, the transferor of the assets. Complete symmetry was provided by the simultaneous cancellation of 76,194 shares of Cumberland $25 par capital stock, six percent demand notes, and installment promissory notes (in all respects equivalent to the shares and notes issued by Columbia Gas of Maryland) owned by the parent Columbia Gas System. Since January 1, 1961, then, Columbia Gas System has been the parent of both Cumberland and Columbia Gas of Maryland. The intrastate distribution business of the former has been regulated by the West Virginia Public Service Commission, that of the latter by the Maryland Public Service Commission.

In connection with the above transactions, plaintiffs made the following purchases of Federal documentary stamps which are issued pursuant to the documentary stamp tax provisions of the Internal Revenue Code of 1954. Columbia Gas of Maryland paid $1,905 under

the capital stock original issue tax provision for stamps to be affixed to the 76,194 shares of new capital stock, § 4301.[1] It also paid $761.94 for stamps under the stock transfer tax provision on the theory that it had really originally issued the shares to Cumberland which in turn transferred them to Columbia Gas System, § 4321.[2] In addition, Cumberland purchased $19.80 of stamps for the tax on conveyances of real property, § 4361. Plaintiffs later determined they had mistakenly believed a tax was payable; they concluded and maintained here that the transactions should have been exempt from stamp taxes under section 4382(b) (1) (D). That provision reads as follows:

§ 4382. *Exemptions.*

\*   \*   \*   \*   \*   \*

(b) *Certain reorganizations, etc.*

The taxes imposed by sections 4301, \* \* \* 4321, \* \* \* and 4361 and shall not apply to—

(1) *Corporate and railroad reorganization.*

The issuance, transfer, or exchange of securities, or the making, delivery, or filing of conveyances, to make effective any plan of reorganization or adjustment—

(D) whereby a mere change in identity, form, or place of organization is effected, \* \* \*.

There is no question that the rearrangement of corporate structure constituted a reorganization—at least for income tax purposes. The Internal Revenue Service ruled, as the parent Columbia Gas System requested, that the transactions were comprehended by the term "reorganization" under section 368(a) (1) (D), which covers, *inter alia*, so-called "divisive reorganizations." The sole question is whether the reorganization also qualifies as one effecting "a mere change in identity, form, or place of organization" for purposes of the stamp tax law.

Subparagraph (D) of section 4382 (b) (1) was added to the exemption provision by section 141 of the Excise Tax Technical Changes Act of 1958, 72 Stat. 1275, 1302. Prior to 1958, there was no comparable exemption, so the taxes here would clearly have been applicable. See e. g., American Mail Line, Ltd. v. United States, 101 F.Supp. 364, 121 Ct.Cl. 63 (1951). Our task is to determine how broad the additional exemption was intended to be. In proposing to the Senate that the exemption be added to the House bill, the Senate Committee on Finance stated the following:

> (k) *Exemption for corporate reorganizations involving a mere change in identity, etc.*

Your committee has amended the proposed code section 4382 provided by the House bill to add a new exemption in the case of corporate reorganizations where the change is a mere change in identity, form, or place of organization, however effected. Such corporate reorganizations along with certain other types of reorganizations, presently are free of income tax. Reorganizations involving a mere change in identity, form, or place of organization, represent merely a formalistic change and do not involve any shifts in ownership. For that reason, your committee has excluded such reorganizations from the issuance and transfer taxes on stocks and certificates of indebtedness as well as from the tax on the conveyance of real property. [S.Rep.No.2090, 85th Cong., 2d Sess., p. 61 (1958), 1958–3 Cum. Bull. 584, 644, U.S.Code Cong. & Admin.News 1958, p. 4454.]

---

1. All section citations are to the Internal Revenue Code of 1954, 26 U.S.C. (1964 Ed.).

2. In 1962, plaintiffs decided that this liability was properly Cumberland's as the constructive transferor, and accordingly arranged intercompany billing to have Cumberland reimburse Columbia Gas of Maryland. In the petition, plaintiff Columbia Gas of Maryland claims the $761.94 refund; plaintiff Cumberland claims it alternatively if Columbia Gas of Maryland is not the proper party in interest.

Reference to the freedom from income tax of corporate reorganizations involving "a mere change in identity, form, or place of organization, however effected" shows that the Committee had subparagraph (F) of section 368(a) (1) in mind. This provision, commonly known as the "F reorganization" provision, covers, at the least, such transactions as a mere reincorporation in another state and a change of name effected by a merger into a newly created corporation. There is doubt whether it covers much more,[3] although in recent years, the government has attempted to give it greater vitality by using it as a weapon against a liquidation immediately followed by a reincorporation—a device which transforms dividends into capital gains.[4] A possible explanation for its near vestigial status is that most tax-free reorganizations are more specifically provided for by the other subparagraphs of section 368(a) (1). Few taxpayers will proceed with a reorganization before obtaining a ruling and, as in the present case, the tendency is probably to limit the grounds for the request to the strongest and most specific—for example, Columbia Gas System asked for a ruling only under subparagraph (D) of section 368(a) (1). There was one recent case, however, in which the taxpayer did ask for a ruling not only under subparagraph (A) of section 368(a) (1), but also under subparagraph (F), and the Service ruled favorably on both. Cabot Corporation v. United States, 220 F.Supp. 261 (D.Mass.1963), aff'd per curiam, 326 F.2d 753 (1st Cir. 1964). Cabot demonstrates, although it was not there in issue, that it is possible for a reorganization to qualify both under subparagraph (F) as well as the more specific subparagraphs of section 368(a) (1). That is undisputed here.

For our purposes, Cabot is more important for interpreting the stamp tax exemption provision in issue here. We think it correctly interprets the stamp tax exemption by reading it narrowly.

3. Section 368(a) (1) (F) is not explained in the regulations and it has received very little administrative or judicial attention. The commentators appear to be unanimous that it is the least significant of the reorganization provisions, and that it is doubtful what, if any, reorganizations would not be covered more specifically by another definition. See Bittker, Federal Income Taxation of Corporations and Shareholders 359 (Federal Tax Press 1964); Paul, Studies in Federal Taxation 82 (3d Ser. 1940); 3 Mertens, Law of Federal Income Taxation § 20.94; Surrey and Warren Federal Income Taxation 1525 (1960 Ed. Foundation Press 1962). In 1954, the House proposed its repeal. It was retained, however, perhaps at the request of the tax bar, representatives of which noted that subparagraph (F) clearly covered reincorporations of all of a corporation's assets in another state or in the same state after expiration of a charter—transactions which might not meet the other definitions of a reorganization. See statements of the American Bar Association, Section of Taxation, and the Association of the Bar of the City of New York, Committee on Taxation. 1 Hearings before the Senate Committee on Finance on the Internal Revenue Code of 1954, 83d Cong., 2d Sess., pp. 403, 539 (1954).

4. In Pridemark, Inc. v. Commissioner, 345 F.2d 35 (4th Cir. 1965), the taxpayer corporation, a dealer in prefabricated houses, sold its sales business assets to its supplier and formulated a plan of liquidation. Without more, this would entitle the corporation to tax-free treatment on the sale of the assets and the stockholders to capital gain treatment of any gain on the redemption of their shares, §§ 331, 337. Before the corporation was dissolved, however, the shareholders decided to form a new corporation to sell prefabricated houses. The Commissioner asked the court to compress the transactions and consider them as a mere reincorporation within the section 368(a) (1) (F) definition. This would have the effect of transforming the liquidation distribution payments to the shareholders into dividends, taxable at ordinary income rates. Reversing the Tax Court, the Fourth Circuit found substance in the transactions and noted that there was much more than an uninterrupted continuation of the corporate enterprise. In a similar vein is Hyman H. Berghash, 43 T.C. 743 (1965), appeal pending (2d Cir.), the difference being that a new owner was taken into the new corporation invoking the shift in ownership problem (discussed infra).

The facts there were the following: A company we shall call the X Corporation, a Massachusetts corporation, owned all the stock of two subsidiaries, the A Corporation and the B Corporation, likewise Massachusetts corporations. X Corporation also owned 95 percent of the stock of C Corporation, another Massachusetts corporation; the remaining 5 percent was owned by individual shareholders of X Corporation and a few outsiders. X Corporation had for some time been considering merging with its subsidiaries for business reasons but decided on an out-of-state reincorporation on its comptroller's advice that a Massachusetts tax could be thereby avoided. To effect this plan, Y Corporation was incorporated in Delaware, and X plus A, B, and C were thereafter merged into Y. Under the terms of the merger agreement, roughly 97 percent of the Y Corporation shares was issued in exchange for the outstanding shares of X Corporation. The remaining 3 percent was exchanged for the C Corporation stock held by the outsiders and by the individuals who also owned X Corporation stock. Focusing on the language in the Senate Report that the exemption was to apply to "[r]eorganizations involving a mere change in identity, form, or place of organization * * * [*which*] *do not involve any shifts in ownership* [emphasis added]," the District Court concluded that the slightest shift of proprietary interest was sufficient to disqualify the transaction. It noted that the former X shareholder owned a different percentage of the Y Corporation after the merger, and that "[s]uch a shift in substantive rights of ownership does not fall within the exemption provided by subparagraph D [of section 4382(b) (1)]." 220 F.Supp., at 265.

The plaintiffs have argued strenuously that *Cabot* supports their position because in the reorganization of the West Virginia and Maryland businesses, there was no shift in the ultimate ownership—i. e., Columbia Gas System at all times owned all the equity. The defendant does not really contest the latter statement of fact; rather, it argues that the shift in ownership test does not stand alone but is simply a necessary ingredient of the requirement of "a mere change in identity, form, or place of organization." We agree with defendant that plaintiff is not entitled to the exemption simply on a showing that there was no shift in proprietary interest. It seems to us that the real question must be whether a divisive reorganization like the present can be considered "a mere change in identity, form, or place of organization, however effected" for stamp tax purposes notwithstanding the absence of a shift in ownership. The legislative history and *Cabot* do appear to establish a 100 percent continuity of interest requirement for the stamp tax exemption which may be more stringent than the case law and administrative practice relating to F reorganizations. See San Joaquin Fruit & Inv. Co. v. Commissioner, 77 F.2d 723 (9th Cir. 1935), rev'd on other grounds, 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed. 824 (1936); Rev.Rul. 54–193, 1954–1 Cum. Bull. 106; Rev.Rul. 61–156, 1961–2 Cum. Bull. 62. But see Helvering v. Southwest Consolidated Corp., 315 U.S. 194, 62 S.Ct. 546, 86 L.Ed. 789 (1942). However, the continuity of interest aspect is not very helpful here because it is really not the issue. Put simply, the difficulty in this case comes about because of the "divisive" aspect. Earlier, we questioned the breadth of the F reorganization provision to which Congress looked in adding the stamp tax exemption. We concluded that it is rather narrow, and we now read the history to the exemption provision to further narrow or at least not widen the meaning of the F reorganization language. Read in this light, "a mere change in identity, form, or place of organization" has a very limited scope. Thus, we do not strain to attach great significance to each of the words in the phrase. It would, of course, be reasonable to attempt to give meaning to each word and thereby conclude that since Congress used the word,

"form," it meant it to mean something other than "identity" or "place of organization." It would further be reasonable to conclude that the transfer of the Maryland gas distribution business from Cumberland to Columbia Gas of Maryland was a change in the "form" of doing business. But, although reasonable, we do not think Congress intended such an interpretation. Congress said a "mere" change in the statute, and the Committee report said "merely a formalistic change." We think the choice of "mere" indicates that the phrase should be given a unitary construction, and if that is the case, the divisive reorganization here falls outside the definition. It is too much of a stretch to say that the fractionation of a business into different corporate entities is comparable to a reincorporation or a change of name.

We find support in other areas of tax law for our holding that subparagraph (D) of the stamp tax exemption does not comprehend this kind of divisive reorganization. For example, Congress has had to enact provisions to deal with loss carryovers of parties to corporate reorganizations. In section 381(b), it is provided that except for F reorganizations, "[t]he taxable year of the distributor or transferor corporation shall end on the date of distribution or transfer." The regulations state this idea in the affirmative regarding F reorganizations: "In the case of [an F reorganization] * * * the acquiring corporation shall be treated (for purposes of section 381) just as the transferor corporation would have been treated if there had been no reorganization." Treas. Reg. § 1.381(b)–1. In other words, the taxable year of the transferor really carries over to the acquiring corporation and net operating losses generated by the acquiring corporation after the transfer can be carried back to be used against prior earnings of the transferor. This is significant because the whole scheme suggests one surviving or successor corporation. In fact, the regulations are very clear that divisive reorganizations

are not covered at all by section 381, making it appear that at least for purposes of this section, F reorganizations and divisive reorganizations are mutually exclusive. Treas.Reg. § 1.381(a)–1(b) (3). Much the same can be inferred from section 1244(d) (2), a provision enacted concurrently with section 4382(b) (1) (D) in 1958. Section 1244 gives favored ordinary loss treatment to losses realized on sales or exchanges of stock of qualifying small business corporations. In the "Special Rules" subsection (d), paragraph (2), it is provided that for certain purposes "a successor corporation in a reorganization described in section 368(a) (1) (F) shall be treated as the same corporation as its predecessor." As in section 381, the suggestion is that there will be one successor in an F reorganization. Surely sections 381 and 1244 do not dispose of our stamp tax exemption problem, but they do give an idea of the apparent scope of the F reorganization provision and of what Congress might have intended in using identical language in section 4382(b) (1) (D). Together, they make it very doubtful that a divisive reorganization could be an F reorganization for income tax purposes; we have already indicated that the stamp tax exemption is at least as narrow as the income tax provision.

■■ To summarize, we think that Congress intended for the stamp tax exemption to be narrowly construed. We think this is borne out by a review of the F reorganization area, of the scanty 1958 legislative history, and of the *Cabot* case. The income tax provisions simply bolster this conclusion. Thus, reading the exemption narrowly, we conclude that plaintiffs' reorganization was more than "a mere change in identity, form, or place of organization" and not the kind of reorganization which Congress intended to exempt. Accordingly, plaintiffs' motion for summary judgment is denied, defendant's motion for summary judgment is granted, and the petition is dismissed.

COWEN, Chief Judge (dissenting):

The construction of a statutory text, unaided by an unequivocal expression of the legislative intent or by crystallized judicial precedent, is a task seldom without its distinctions in preference—distinctions which more often than not are ones of emphasis rather than total disagreement. The stamp tax exemption now before us illustrates such differences of emphasis.

With the majority's premise that the exemption should be read narrowly, I concur. With its conclusion that the plaintiffs do not fall within the limited confines of the provision, I respectfully dissent.

Section 4382(b) (1) (D) of the Internal Revenue Code speaks in terms of "*any* plan of reorganization or adjustment * * * whereby a mere change in identity, form, or place of organization is effected."[1] I am unable to find any indication that Congress intended in that section to distinguish between divisive reorganization and the more familiar type of reincorporation. Cumberland's fractionation into separate corporate entities was prompted by legitimate business motives and effected no more than a change in its form and place of organization. Moreover, it is acknowledged that the rearrangement of the corporate structure qualified as a reorganization within the meaning of Section 368(a) (1) (D). If we adhere strictly to the wording of Section 4382(b) (1) (D), the reference therein to "any plan of reorganization" is certainly broad enough to encompass the arrangement undertaken by plaintiffs.

The majority has alluded to the scanty legislative history and the paucity of decisional law on the issue presented in this case. Nevertheless, I cannot escape the conclusion that both of these aids to statutory construction favor the exemption claimed by plaintiffs. The last two sentences of the report of the Senate Committee on Finance (quoted in the majority opinion) read:

Reorganizations involving a mere change in identity, form, or place of organization, represent merely a formalistic change and do not involve any shifts in ownership. *For that reason* [emphasis supplied], your committee has excluded such reorganizations from the issuance and transfer taxes on stocks and certificates of indebtedness as well as from the tax on the conveyance of real property. [S.Rep.No. 2090, 85th Cong., 2d Sess., p. 61 (1958), 1958–3 Cum.Bull. 584, 644, U.S.Code Cong. & Admin.News 1958, p. 4454.]

The fact that "that reason" is singular suggests to me that the phrase "represent merely a formalistic change" is in apposition to the phrase "do not involve any shifts in ownership." If the two phrases were intended to have different meanings, I think the Senate Committee on Finance would have said "those reasons."

The only case which provides any real help on the question before us is Cabot Corp. v. United States, 220 F.Supp. 261, 265 (D.Mass.1963), aff'd per curiam, 326 F.2d 753 (1st Cir. 1964). The primary emphasis in that opinion can be summarized in the court's expression that "a shift in substantive rights of ownership does not fall within the exemption provided by subparagraph D."

Finally, according to Revenue Ruling 63–203, 1963–2 Cum.Bull. 580, 581:

[Section 4382(b) (1) (D)] is not applicable to a change which involves *any* shift in ownership, because in any shift in ownership there is involved more than a mere change in identity, form, or place of organization.

Here, it is conceded that there has been no shift in the ownership of the businesses. Therefore, the legislative history, the *Cabot* case, and the cited revenue ruling provide persuasive authority for the proposition that plaintiffs are entitled to the claimed exemption.

1. Emphasis added. The same language is contained in Treas.Regs. 47.4382–1(d) (iv).

On the admittedly close question to be decided, I cannot join the majority in the emphasis it has placed upon the term "mere" in the pertinent statute. Relying on the authorities cited above, I would stress the fact that Congress did not differentiate among the different types of corporate reorganizations when no shifts in ownership are involved. Accordingly, I would grant plaintiffs' motion for summary judgment.

COLLINS, Judge, joins in the foregoing dissenting opinion.

### On Motion for Rehearing

Rehearing denied.

JONES, Senior Judge, concurs in overruling the motion on the ground that the change in plaintiffs' organization involved a change in the mode and rate of regulation, as well as a variation in the structure of both subsidiary distributing companies. These subsidiaries were part and parcel of the holding company and were a vital part of its operations. The change, therefore, was much more than a mere change in identity form or place of organization.