HARRIMAN NATIONAL BANK, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 372.

Circuit Court of Appeals, Second Circuit.

Aug. 4, 1930.

HAND, Circuit Judge, dissenting.

Cotton, Franklin, Wright & Gordon, of New York City (Boykin C. Wright and Charles C. Parlin, both of New York City, of counsel), for petitioner.

G. A. Youngquist, Asst. Atty. Gen., J. Louis Monarch, Sp. Asst. to Atty. Gen., and Dean P. Kimball, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., of counsel), for respondent.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge.

The opinion below, reported in 14 B. T. A. 743, states that the sole question presented to the Board was whether the bank was a dealer in securities during the taxable years under review, and as such entitled to return its income on the basis of inventories of its securities. The Commissioner had denied it the use of inventories, resulting in the imposition of deficiencies in taxes aggregating some $220,000. The Board of Tax Appeals confirmed these deficiencies on the ground that the evidence was insufficient and left the Board in doubt whether or not the bank was a dealer in securities.

Section 203 of the Revenue Act of 1918 (40 Stat. 1060) and section 203 of the Revenue Act of 1921 (42 Stat. 231) provide in identical language:

"That whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer, upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income."

By article 1585 of Treasury Regulations 45, promulgated under the Revenue Act of 1918, it was provided that a dealer in securities might under specified circumstances use inventories in making his income tax return, and the article defined the term "dealer" in securities as follows:

" * * * For the purpose of this rule a dealer in securities is a merchant of securities, whether an individual, partnership, or corporation, with an established place of business, regularly engaged in the purchase of securities and their resale to customers, that is, one who as a merchant buys securities and sells them to customers with a view to the gains and profits that may be derived therefrom. If such business is simply a branch of the activities carried on by such person, the securities inventoried as here provided may include only those held for purposes of resale and not for investment. Taxpayers who buy and sell or hold securities for investment or speculation, and not in the course of an established business, and officers of corporations and members of partnerships, who in their individual capacities buy and sell securities, are not dealers in securities within the meaning of this rule."

The applicable regulation under the Revenue Act of 1921 is substantially the same. Article 1585 of Treasury Regulations 62.

It is not denied that it is within the legal powers and within the common practice of national banks to deal in negotiable securities. See Mercantile Nat. Bank v. New York, 121 U. S. 138, 156, 7 S. Ct. 826, 30 L. Ed. 895; Yerkes v. National Bank, 69 N. Y. 382, 387, 25 Am. Rep. 208; People ex rel. Pratt v. Goldfogle, 242 N. Y. 277, 295, 151 N. E. 452. Nor is it denied that a national bank, if it conforms to the requirements of the above-quoted regulation, may, for purposes of taxation, inventory the securities held by it for resale. The dispute is solely one of fact, namely, whether the evidence shows the petitioner to be a dealer.

Its witnesses were Mr. Colombo, an accountant who had been in its employ for approximately ten years, Mr. Burke, its vice president and comptroller, and Mr. Turner, its chief clerk. The accountant identified Exhibits 1, 2, 3, and 4 as prepared by him from the books of the bank, with the exception of the figures showing market quotations. By stipulation the exhibits were conceded to be correct transcripts from the books and to contain correct market quotations. They tabulate (a) the cost of the bank's securities at the beginning of each of the years in question; (b) the market value on January 1 of each year except 1918; (c) purchases during each year; (d) sales during each year; and (e) market value at the end

of each year. The accountant stated that the books were kept, as required by the National Banking Law, upon the basis of cost, but that supplementary sheets showing the market value of securities were also kept and were available for making up the income tax returns for the years in question. The supplementary book had been lost in the course of changing from one banking house to another. The original tax returns did not use inventories, but by amended returns the use of this method was claimed.

Mr. Burke and Mr. Turner testified as to the character of the bank's dealings in securities. The former said that during each of the years in question the bank bought and sold securities as part of its business. He had charge of such buying and selling, and in making purchases he considered safety of the security the dominant factor, by which "he meant safety from the viewpoint of the customer—the people to whom the Bank might sell securities." Mr. Turner testified that he had been in the employ of the bank for fifteen years and was familiar with the buying and selling of securities by the bank during all of the taxable years. The bank maintained a separate department for the buying and selling of securities. All the securities listed upon the four exhibits mentioned above were held by the bank for resale. He had charge of the books, and no separate account was kept for profits and losses resulting from the sale of securities; "nor did they segregate individual profits in any department," but the same were recorded in the general profit and loss account. The bank purchased securities to fill specific orders only when they did not have the securities in hand. He said the idea of the bank in carrying securities was to fill orders; if it thought prices were reasonable it would sell the securities it had. Asked if it was the bank's policy to buy with the idea of immediate prospect of market changes, or with the idea of the soundness of a long-term investment, he replied: "I think you are confusing the two again. It is not a question of investment, but of resale value. If they thought they could sell the securities quickly; it was not a question of investment; it was a question of carrying securities we held ready for anybody that may want them."

And again: "They were bought to be held in case people would consider buying. There are several features which are taken into consideration. For instance, the bond buyers, if they thought it advisable, would take some of these bonds and hold them for customers; something they know is impending. That is the basis on which these things were purchased."

Mr. Turner also testified that during the years in question bonds had been purchased for the purpose of using them as a pledge to secure circulation and postal savings, but the amount of the bonds so used does not appear. During the taxable years sales amounted to more than $23,000,000 and purchases to over $25,000,000, as shown by the exhibits.

The foregoing summary of the testimony suffices, in our opinion, to make a prima facie showing that the bank was a dealer in securities within the meaning of the Treasury Regulations. It shows that it was "a merchant of securities," that is, "one who as a merchant buys securities and sells them to customers with a view to the gains and profits that may be derived"; that it was "regularly engaged in the purchase of securities and their resale to customers," having a separate department for such purchases and sales and an established place of business.

The respondent called no witnesses to rebut this testimony, and relies only on inferences which it draws from the petitioner's testimony and from the exhibits. By an analysis of the exhibits, which excludes short-time government certificates and securities which matured during the year and were inferred to have been paid rather than sold, the respondent demonstrates a low ratio of sales to securities on hand or purchased during the year, and a slow turnover. It infers that by far the larger part of the securities were held for investment, with merely incidental sales to customers when the bank wished to dispose of investments. But we see no justification for excluding short-term United States securities from the computation. There is no more reason to suppose that they were bought for investment and held until maturity than to suppose that they were bought for sale and many of them actually sold. It is common knowledge that this particular type of security is more frequently bought and sold through banks than any other type. See Yerkes v. National Bank, 69 N. Y. 382, 387, 25 Am. Rep. 208. Nor should bonds which matured during the year be excluded. The inference that they were sold before redemption is as likely as the opposite inference. The fact that numerous securities were held for long periods may be explained by the fact that they were bought too high and the bank was unwilling to take its loss at current prices. While it is true that no separate account was kept for profits or losses resulting from the sale of securities, it was not the practice to

segregate the individual profits of any department. In short, without answering in detail all of the respondent's arguments, it will suffice to say that we do not think the inferences attempted to be drawn from the exhibits and testimony overthrow the positive testimony of the witnesses as to the character of the bank's dealings in securities. The Board may not ignore a preponderance of the undisputed testimony. Chicago Ry. Equip. Co. v. Blair, 20 F.(2d) 10 (C. C. A. 7); Bessemer Inv. Co. v. Commissioner, 31 F.(2d) 248 (C. C. A. 2). On the record before it, the Board should have found the petitioner to be a dealer in securities.

Accordingly, its decision is reversed and the cause remanded.

L. HAND, Circuit Judge (dissenting).

I do not believe that we ought to decide this case alone by the verbal correspondence of the facts to the regulation. I agree that the bank sold some of its securities to "customers" at a "regularly established place of business," was ready to sell all, and that in buying it had the possibility of such sales in mind. However, it did not prove how large a proportion of these it sold each year, though the facts were all in its hands. Rather it contented itself with general statements which throw no light on that question. An individual may do a business in securities with customers and he may combine with it trading on exchanges and holding securities for investment. I should not call him a merchant as to all his securities if the proportion he sold to customers was trivial. Rather I should say that the sales to customers were a side-line, as it were, of the general business.

It is certainly curious when one examines the schedules here in evidence that by far the greater part of the supposed sales are of those securities which matured in the year in question. My brothers say that they might have been sold notwithstanding. So they might, but I submit that the bank ought to have shown that they were. If we do not so assume the sales may have been a trifling part of the transactions. Even as to these the bank does not tell us how many went to customers, how many were sold on the exchanges. If it wished to come within the regulation, it ought to have been more specific.

Certainly it would not be enough to show that a bank was ready to sell anything which it held; most people are. One cannot practically apply the regulation without knowing the proportion between what is held and what is sold to customers. It will not do to say

that any merchant may have to hold over unsalable securities; this was a steady business and there is no reason to assume that these were sluggish years. Moreover, the bank had other quite adequate reasons than sales to customers to retain such large amounts. Its deposits had to be invested anyway and some of the securities required of it were prescribed by law. I can see no more in its proof than that it bought with an eye to possible resales and that it made an undisclosed number of such resales. I cannot think that this was enough.