R. C. RINKEL and Ella L. Rinkel, Plaintiffs,

v.

A. R. KNOX, Former District Director of Internal Revenue, Defendant.

FIRST NATIONAL BANK OF MINNEAPOLIS as Executor of the Estate of F. A. Rinkel, Plaintiff,

v.

A. R. KNOX, Former District Director of Internal Revenue, Defendant.

Nos. 4-59-Civ.-123, 4-59-Civ.-124.

United States District Court
D. Minnesota,
Fourth Division.
July 27, 1961.

W. B. McCallum, Minneapolis, Minn., for plaintiffs.

Louis F. Oberdorfer, Asst. Atty. Gen., Lyle M. Turner, Jerome Fink, John T. Piper, Attys., Dept. of Justice, Washington, D. C., and Clifford Janes, Asst. U. S. Atty., St. Paul, Minn., for defendant United States.

DEVITT, Chief Judge.

The defendant moves for judgment notwithstanding the jury verdict and, in the alternative, for a new trial in this suit to recover income taxes paid for the year 1954 by R. C. Rinkel and Ella Rinkel in the amount of $3,000.98, with interest, and by F. A. Rinkel in the amount of $2,234.84, with interest. A statement of the undisputed facts follows.

At the time of his death on July 21, 1953, one J. J. Jorgenson owned 228 shares, constituting one-half interest, in Northwest Motor Sales, Inc. (Motor Sales), a corporation which sold and serviced General Motors automobiles and trucks at Warren, Minnesota. The business was originally operated as a partnership between Jorgenson and the plaintiffs, R. C. Rinkel and F. A. Rinkel. In 1947, the business was incorporated as Northwest Chevrolet Company with Jorgenson holding one-half of the stock and the two Rinkels each owning 114 shares, or one-fourth interest. The name of the corporation was changed to Northwest Motor Sales, Inc. in 1954.

Motor Sales owned operating assets consisting of equipment and inventory and the building which housed the business operation. The dealer franchise agreement in effect in 1953 between Motor Sales and General Motors provided that General Motors could cancel the franchise on the death of Jorgenson. On August 10, 1953, several weeks after Jorgenson's death, General Motors cancelled the selling agreement but allowed the corporation to continue selling Chevrolet automobiles. General Motors would not grant a new franchise as long as the estate of Jorgenson continued to have an interest in the corporation. Negotiations started between the Rinkels and the heirs of Jorgenson for the purchase by the Rinkels of the Jorgenson one-half interest in the business. The parties agreed on a price for the operating assets but could not agree on the value of the building.

Some time prior to February 26, 1954, an agreement was reached between the Rinkels and the Jorgenson heirs whereby the building would be separated from the other business assets. This was to be effectuated by having Motor Sales spin-off, or transfer, the building to a new corporation formed for the purpose of owning the building. The stock in the new corporation would then be distributed in the same proportion that the Motor Sales stock was held. Since General Motors didn't object to the Jorgenson heirs having an interest in the building, the way was clear for the Rinkels to buy out the interest of the Jorgenson heirs in Motor Sales and keep the franchise agreement with General Motors.

As a result of this agreement, on February 26, 1954, Motor Sales paid the sum of $42,731.29 to the Jorgenson estate in full payment for the estate's interest in Motor Sales—exclusive of the building. At this time the building was still owned by Motor Sales. On March 18, 1954, the new corporation known as Northwest Company, Inc. (building corporation) was organized to hold the building. Thereafter, on April 19, 1954, a series of actions consummated the remaining features of the plan. On that date, the directors and shareholders of Motor Sales and of the building corporation met and approved the plan. The building was transferred from Motor Sales to the new building corporation in exchange for all the stock of the building corporation. The stock was then distributed to the parties in the same proportion as their respective interest in Motor Sales; that is, 240 shares or one-half interest to the Jorgenson heirs and 120 shares or one-

fourth interest to each of the Rinkels. Also, the building was leased back from the building corporation to Motor Sales.

Lastly, the Jorgenson shares in Motor Sales were transferred back to Motor Sales. One-fourth of this returned stock was retained by the company as treasury stock and the other fourth was sold to one Art Johnson, the new manager of Motor Sales. As previously noted, the cash payment of $42,713.92 to the Jorgenson heirs for their interest in Motor Sales had actually been made on February 26, 1954.

The government taxed as dividend income to the Rinkels the distribution of stock in the building corporation. The Rinkels contended that this transaction was a corporation reorganization and that the distribution of the new building corporation stock was, under the law, free of tax.

The case was tried to a jury on October 11, 1960. A special verdict was submitted to the jury reading as follows:

"Was the N. W. Company (Realty Co.) used principally as a device for the distribution of earnings and profits to the shareholders of the N. W. Motor Sales Company?"

The jury answered this question in the negative and the government has submitted this alternative motion for judgment notwithstanding the verdict—specifically for judgment in accordance with its proposed special verdicts numbered one [1] and two [2] which were withdrawn from the

jury and decided in the affirmative by the Court—or for a new trial.

The provisions of sections 22(e) [3] and 115(a) [4] of the 1939 Internal Revenue Code, 26 U.S.C.A. §§ 22(e) and 115(a), make taxable the stock distribution involved in this case unless the provisions of sections 112(b) (11) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 112 (b) (11), apply to make the distribution tax free. That section provides as follows:

"(11) Distribution of stock not in liquidation. If there is distributed, in pursuance of a plan of reorganization, to a shareholder of a corporation which is a party to the reorganization, stock (other than preferred stock) in another corporation which is a party to the reorganization, without the surrender by such shareholder of stock, no gain to the distributee from the receipt of such stock shall be recognized unless it appears that (A) any corporation which is a party to such reorganization was not intended to continue the active conduct of a trade or business after such reorganization, or (B) the corporation whose stock is distributed was used principally as a device for the distribution of earnings and profits to the shareholders of any corporation a party to the reorganization."

The footnote [5] contains a summary of the requirements of the statute. A re-

---

1. "Were the sale of the Jorgenson stock in Motor Sales and the transfer of the building from Motor Sales to the new building corporation both parts of a single transaction?"

2. "If the sale of the Jorgenson stock and the transfer of the building were not parts of a single transaction, did the sale of stock occur before the transfer of the building to the new corporation?"

3. "§ 22. Gross income.
    *       *       *       *       *
    "(e) *Distributions by corporations.* Distributions by corporations shall be taxable to the shareholders as provided in section 115."

4. "§ 115. Distributions by corporations.
    "(A) (as amended by Sec. 166, Revenue Act of 1942, c. 619, 56 Stat. 798) *Definition of Dividend.* The term 'dividend' when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year * * * without regard to the amount of the earnings and profits at the time the distribution was made * * *"

5. 31 Tax Magazine 716, 718 (Sept. 1953):
    "(1) There must be a reorganization as defined in the statute, and such reor-

organization is defined in the Code, 26 U.S.C.A. § 112(h), as follows:

"The term 'reorganization' means * * * (D) a transfer by a corporation of all or a part of its assets to another corporation *if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred * * *"* [Emphasis supplied.]

The word "control" as used in the preceding quoted section is defined in 26 U.S.C.A. § 112(h), as follows:

*"Definition of control.* As used in this section the term 'control' means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation."

The Government's primary contention is that the first four requirements of section 112(b) (11) have not been met in that the plan used by the Rinkels and Jorgenson heirs did not constitute a "reorganization" within the statute. The government argues that there was no reorganization because immediately after the transfer of the building from Motor Sales to the new building corporation, Motor Sales or its stockholders were not in "control" of the building corporation as required by section 112(g) (1) (D) and defined in section 112(h).

The government submits that immediately after the transactions on April 19, 1954, Motor Sales and its stockholders did not have "control" of the new building corporation because the Jorgenson estate owned 50 per cent of the stock of the building corporation and the estate was no longer a shareholder of Motor Sales. Consequently, since Motor Sales or its shareholders owned only 50 per cent of the interest in the building corporation, instead of the required 80 per cent, no "reorganization" existed under the specific requirements of the statute. This is true, the government submits, unless the transfer of the building and the redemption of the Jorgenson stock in Motor Sales can be treated as separate steps with the redemption following the transfer of the building. If treated in this fashion, the Jorgenson estate would still be a stockholder in Motor Sales at the time the transfer of the building was made and, consequently, Motor Sales would have the required "control" of the building corporation immediately after the transfer. In fact, Motor Sales would then have had 100 per cent control of the building corporation.

It is the government's position that all the steps in this attempted reorganization plan constituted a single transaction arising out of an integrated plan. It argues that the redemption of all the Jorgenson stock in Motor Sales became a part of the same transaction in which the building was transferred to the building corporation in exchange for the distribution of the building corporation stock. Under this theory, the Jorgenson heirs became disengaged from any interest in Motor Sales in the same transaction in which they acquired a 50 per cent interest in the building corporation. As a result, the transferor, Motor Sales, did not have "control" of the building corporation immediately after the transfer of the building.

ganization must comply with the requirements established by the judiciary.

"(2) The distribution must be in pursuance of a plan of reorganization.

"(3) The distribution must be to a shareholder of a corporation which is a party to the reorganization.

"(4) The distribution must be of stock (other than preferred stock) in another corporation which is a party to the reorganization.

"(5) There must be no surrender by the distributee of stock.

"(6) Any corporation which is a party to the reorganization must intend to continue the active conduct of a trade or business after such reorganization.

"(7) The corporation whose stock is distributed cannot be used principally as a device for the distribution of earnings and profits to the shareholders of any corporation a party to the reorganization."

The taxpayers recognize the existence of the step transaction or single transaction doctrine but contend that in a situation like the one involved herein, where a strong and legitimate business purpose exists for the attempted reorganization, the single transaction doctrine should not be applied.

During the trial of this case, the Government submitted three proposed special verdict questions to be given to the jury.[6] Only the third question was submitted to the jury and, as previously indicated, the jury answered the question in the negative. The Court decided that the first two questions should be answered in the affirmative and with this determination the taxpayers' counsel agreed. Therefore, it appears that no controversy exists concerning the fact that the steps or transactions in this action constituted a single transaction. The only question is whether the single transaction doctrine should be applied to the facts in this case.

Taxpayers cite many cases for the proposition that the doctrine is most often used in those situations where the taxpayer has attempted to gain a significant reduction in his taxes by the transaction that has been questioned. Even assuming that to be true, it presents no valid reason why the doctrine should not be applied here. The taxpayers cite Wilkins v. United States, D.C.S.D.Ill.N.D. 1960, 188 F.Supp. 91, in support of their contention that the single transaction theory should not be applied where a business purpose exists for the attempted reorganization. That case is not authority for that argument. The single transaction doctrine was not discussed in the Wilkins case since the government admitted that the transaction involved was a reorganization.

It is clear that the courts have used the single transaction doctrine in cases where the taxpayer had a legitimate business purpose for the attempted reorganization. See Weicker v. Howbert, 10 Cir., 1939, 103 F.2d 105; Case v. Commissioner, 9

Cir., 1939, 103 F.2d 283. No good reason is advanced, or authority cited, why the single transaction doctrine should not be applied to a case of this kind; and since neither the transferor corporation, Motor Sales, or its stockholders, held an 80 per cent interest in the building corporation immediately after the transfer of the building, there was no reorganization under section 112(b) (11), and the stock distribution was a dividend subject to tax.

It appears, as a matter of law, that the defendant is entitled to judgment. It is so ordered.

---

6. See Footnotes 1 and 2 for the first two questions and page 23, supra, for the third question.