**STEPHENS, INC., Appellee and Cross-Appellant,**

v.

**UNITED STATES of America, Appellant and Cross-Appellee.**

**Nos. 71–1571 and 71–1586.**

United States Court of Appeals, Eighth Circuit.

Submitted May 9, 1972.

Decided July 10, 1972.

Rehearing and Rehearing En Banc Denied Aug. 22, 1972.

Herschel H. Friday, Jr., and William H. Bowen, Little Rock, Ark., for Stephens Inc.

William L. Goldman, Atty., Tax Div., Dept. of Justice, Washington, D. C., for United States.

Before LAY, BRIGHT and ROSS, Circuit Judges.

LAY, Circuit Judge.

This is an appeal arising out of a judgment in the sum of $576,424.63 in favor of the taxpayer in a suit for refund of taxes. The focal issue turns on whether the claim of the taxpayer, Stephens, Incorporated, that it was acting as a securities dealer when handling the stocks of five separate corporations, is correct. The district court held that as to four of these corporate stocks—Hollis & Company, V. E. Schevenell, Incorporated, Tuf-Nut Company and Public Utilities Company of Crossett, Arkansas —the taxpayer qualified as a "dealer," thus enabling it to claim certain sale or inventory losses for the years of 1960, 1964 and 1965 resulting from a devaluation of the stock in question. Stephens, Inc. v. United States, 321 F.Supp. 1159 (E.D.Ark.1970). The government appeals this determination. The district court also found that as to the stock of Stephens Finance Company, taxpayer was not a "dealer." On a separate issue the court ruled against the taxpayer's contention that it had accomplished a taxable liquidation of the Public Utilities Company of Crossett, Arkansas. Stephens, Inc. cross-appeals these rulings. We reverse and remand with directions to enter judgment in favor of the government.

Stephens, Incorporated (hereinafter taxpayer) is the nineteenth largest investment house in the United States. It is a member of the Mid-west Stock Exchange and an associate member of the New York Stock Exchange. Taxpayer's policy is to initially place all securities which it purchases in its merchandise inventory. Then within 30 days those

securities which are to become a part of its investment portfolio are segregated and clearly identified as held for investment only. The securities remaining in inventory at the end of its fiscal year, May 31, are valued at cost or market whichever is lower. Any decline in the market value of inventoried securities is used to increase taxpayer's "cost of Goods Sold" deduction in the year when the decline occurs. This inventory method is, of course, available to "dealers" only. See Treas.Reg. 1.471–5.[1]

The government contends that taxpayer was not entitled to inventory the stocks of the five above-named corporations and thus should not be allowed to deduct the decrease in market values of each of these shares. This decrease, the government urges, was created by the taxpayer when it gained control of each corporation and then caused a substantial dividend to be paid to itself thus depleting the surplus and deflating the market value of the stock. The tax benefit which the government seeks to prevent occurs when taxpayer claims the 85 per cent dividend received deduction.[2] This enables taxpayer to pay tax on only 15 per cent of the extraordinary dividend, while at the same time deducting an inventory adjustment in an amount approximately equal to the amount of the dividend which it has received. The government challenges the inventory loss adjustment on the basis that in each of these instances the taxpayer was not acting in its capacity as a "dealer in securities" within the meaning of the above cited Treasury regulation.[3]

The taxpayer contends that it was its purpose in handling these stocks to utilize the dividend as a means of reducing the corporate equity and thereby improving each corporation's ratio of earnings to capital. This, it claims, improved the salability of these shares and is a legitimate merchandising function in keeping with usual dealership operations.

■ The question of whether or not a particular person is a dealer within the meaning of the term as defined in the Commissioner's regulations involves a mixed question of law and fact. Schafer v. Helvering, 299 U.S. 171, 57 S.Ct. 148, 81 L.Ed. 101 (1936); Helvering v. Fried, 299 U.S. 175, 57 S.Ct. 150, 81 L.Ed. 104 (1936); Helvering v. Einhorn, 299 U.S. 175, 57 S.Ct. 150, 81 L.Ed. 104 (1936); Edmund S. Twining, 32 B.T.A. 600, aff'd 83 F.2d 954 (2 Cir. 1936), cert. denied, 299 U.S. 578, 57 S.Ct. 42, 81 L.Ed. 426; Berks County Trust Co. v. Commissioner of Internal Revenue, 78 F.2d 810 (3 Cir. 1935); Hammitt v. Commissioner of Internal Revenue, 79 F.2d 494 (3 Cir. 1935). As stated by the Board of Tax Appeals, this conclusion "involve[s] the proper interpretation of the Commissioner's own regulations and the application of those regulations to the facts." Lansing McVickar, 37 B.T.A. 758, 761 (1938).

■ Treasury Regulation § 1.471–5 provides the basic structure of the definition of "dealer in securities." Numerous cases dealing with this question have elaborated on and clarified this meaning. The Supreme Court has pointed out that

1. Treas.Reg. 1.471–5:
   "For the purposes of this section, a dealer in securities is a merchant of securities, whether an individual, partnership, or corporation, with an established place of business, regularly engaged in the purchase of securities and their resale to customers; that is, one who as a merchant buys securities and sells them to customers with a view to the gains and profits that may be derived therefrom."

2. Section 243(a) provides:
   "In the case of a corporation, there shall be allowed as a deduction an

amount equal to 85 percent of the amount received as dividends (other than dividends described in paragraph (1) of section 244, relating to dividends on the preferred stock of a public utility) from a domestic corporation which is subject to taxation under this chapter."

3. The government's alternative argument that the dividend received deduction should be disallowed under Section 269 need not be dealt with here in view of our disposition of the primary argument.

a dealer may inventory only those securities which he purchases "to create a stock of securities to take care of future buying orders in excess of selling orders" as opposed to those "purchased for the firm's own account solely in expectation of a rise in the market, for sale to anyone at a profit." Schafer v. Helvering, 299 U.S. 171, 174, 57 S.Ct. 148, 150, 81 L.Ed. 101 (1936). See also Frederic H. Brendle, 31 B.T.A. 1188 (1935). Thus, the economic advantage which a dealer seeks to attain through his handling of a security is derived from the markup which he charges his "customers" above the original purchase price of the security, not from any anticipated rise in the market value of the shares. The Tax Court has explained the dealer's profit motive in this manner:

> "In determining whether a seller of securities sells to 'customers' the merchant analogy has been employed. . . . Those who sell 'to customers' are comparable to a merchant in that they purchase their stock in trade, in this case securities, with the expectation of reselling at a profit, not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods. . . . Such sellers are known as 'dealers.' " George R. Kemon, 16 T.C. 1026, 1032–1033 (1951).

The Court of Claims has recently observed:

> "The normal goal of a dealer or merchant in securities is the making of a profit *on the price of the security itself*, or, by acting in the *traditional manner* of middleman or broker, to earn a *commission* or to enjoy some other *dealer concession*." Brown v. United States, 426 F.2d 355, 364, 192 Ct.Cl. 203 (1970). (Emphasis ours.)

That the profit must be attained on the resale is emphasized by the controlling regulation 1.471–5 when it states that a "dealer" is "one who as a merchant buys securities and sells them to customers with a view to the gains and profits that may be derived *therefrom.*" (Emphasis ours.)

It is therefore with some difficulty that we view the following statement of the trial court:

> "It is true that substantial profit proved not to be made from the resales proper, but *the Court does not read the Regulation as requiring that the dealer's anticipated or hoped for profit be derived entirely from the resale itself.* Regard is to be had to the overall dealings with the respective stocks.

> "The testimony of Vernon Giss, a Vice President of Stephens and its Secretary-Treasurer, was to the effect that the book values of the stocks were so high that the stocks *were not readily saleable at those values;* that when the stocks were bought by Stephens *it was contemplated that the dividends would be declared* and the values of the stocks written down. As the Court has suggested heretofore, and as Mr. Giss testified, *the dividends enabled Stephens to recover some of its costs;* also the reduction of the inventory values of the stocks made them more marketable. Indeed *without the write downs Stephens probably could not have sold the stocks and could not have made a profit on its overall transactions with them."* 321 F.Supp. at 1165. (Emphasis ours.)

If this view were to be accepted it would mean that a merchant could properly acquire and inventory a security which he recognized at the outset could not be sold at a profit, but with the intent of securing his profit from the dividends or interest received from the security during the interim between purchase and sale. To the contrary, it is well established that "investor" status attaches to anyone, including a recognized "dealer," who acquires securities with the pri-

mary intent to profit from their income yield. See United States v. Chinook Inv. Co., 136 F.2d 984 (9 Cir. 1943); Commissioner of Internal Revenue v. Charavay, 79 F.2d 406 (3 Cir. 1935); Securities Allied Corp. v. Commissioner, 95 F.2d 384 (2 Cir. 1938), cert. denied, 305 U.S. 617, 59 S.Ct. 76, 83 L.Ed. 393. This is true even though the taxpayer has the status of "dealer" with respect to other similar securities which it properly holds in its inventory. Brown v. United States, 426 F.2d 355, 192 Ct.Cl. 203 (1970); Schafer v. Helvering, supra; Harriman Nat'l Bank v. Commissioner of Internal Revenue, 43 F.2d 950 (2 Cir. 1930); Hammitt v. Commissioner of Internal Revenue, 79 F.2d 494 (3 Cir. 1935); Vaughan v. Commissioner of Internal Revenue, 85 F.2d 497 (2 Cir. 1936), cert. denied, 299 U.S. 606, 57 S.Ct. 232, 81 L.Ed. 447; Carl Marks & Co., 12 T.C. 1196 (1949); Stern Brothers & Co., 16 T.C. 295 (1951).[4]

■■■■ As the facts are briefly reviewed below, we find that taxpayer was not a "dealer" with respect to the stocks of Schevenell, Tuf-Nut, Stephens Finance Co. and Public Utilities.[5] As the facts will demonstrate, taxpayer was not seeking to profit from the traditional dealer markup, commission or handling charge in any of these instances. Moreover, it is apparent that Stephens handled these stocks, not as securities which formed part of a supply of inventory for sale to regular customers as they appear, but rather as vehicles through which it transacted the purchases and sales of operating corporations. The record makes clear that Stephens was engaging in the merchandising of businesses as profitable ventures for investors seeking to buy whole operating units though its method of doing so was through the purchase and sale of stocks. After acquiring control of a corporation, Stephens would set about managing the operation of the company, restructuring the corporate package and making whatever changes it deemed necessary to improve the salability of its "product." In many instances this was done with the knowledge that the original purchase price would not be recovered on resale but that the substantial dividend which it would cause to be paid to itself would enable it to market the corporation at a lesser price while at the same time providing it with a profit from its activities. We find this method of merchandising is not within the traditional meaning of "dealing" in se-

4. Of course, the fact that a dealer receives the income earned by a security during the "carry" period does not automatically make him into an investor. In such an instance the income yielded may be merely incidental to his primary purpose of profiting by the resale of the security to his customers. Stokes v. Rothensies, 61 F.Supp. 444, 450 (E.D.Pa.1945), aff'd 154 F.2d 1022 (3 Cir. 1946). By contrast, where the taxpayer's motives in acquiring the stock is to gain control of and force a reorganization of a corporation for the realization of gain when the issuing company redeems its stock or pays a liquidating dividend, such stocks are not properly merchandise inventory. George R. Kemon, 16 T.C. at 1033.

5. We do not find it necessary to reach the issue concerning Hollis & Co. Notwithstanding the trial court's finding that taxpayer was a dealer as to this stock, we find no justiciable issue for us to resolve. The government disallowed the inventory adjustment claimed on this stock in an audit of taxpayer's fiscal 1962 tax return. The taxpayer did not file a claim for refund to challenge that determination. The statute of limitations now bars any refund from that year. Stephens has raised the issue of the propriety of this adjustment in this lawsuit, not for purposes of obtaining a refund, but on the theory that if the deduction were proper there may be a possible net operating loss carryover deduction to fiscal 1964 and 1965 which are open years before this court. However, the government points out that there has been no showing by the taxpayer that even if it were entitled to the inventory deduction, a loss would result or that such a loss, if any, would be carried *forward* to these later years. This court cannot render advisory opinions and is limited to dealing with questions which have some demonstrable effect on the refunds at issue here. Under these circumstances the question of the proper treatment of Hollis stock should not have been examined in the lower court and cannot be reviewed here.

curities and that such securities, therefore, are not a proper part of a dealer's inventory. The facts set out below amply demonstrate the reasons for our holding.

## V. E. SCHEVENELL, INCORPORATED and TUF-NUT COMPANY

Despite their factual differences we consider these two companies together since there exist certain similarities in taxpayer's handling of these stocks.

On November 11, 1963, taxpayer purchased all of the outstanding stock of V. E. Schevenell, Incorporated for $369,915.09. Prior to making this purchase taxpayer arranged to make an immediate resale of this stock to three purchasers. The resale price was to be substantially less than the original purchase price since it was agreed that after taxpayer acquired these shares it would cause Schevenell to pay it a dividend of $190,000. It is claimed the dividend was intended to reduce the equity of the corporation so that the purchasers would need to make less of an investment to acquire the business.[6] The dividend was paid on November 19, 1963, and thereafter, on December 13, 1963, taxpayer sold this stock in accordance with the agreement for $182,000.00. On its fiscal 1964 tax return, taxpayer reported the dividend as income and claimed a dividend received deduction of $161,500. Taxpayer also reported an ordinary loss deduction of $187,915.09 for the loss which occurred upon the sale of these shares. It is this latter deduction which is challenged by the government.

Taxpayer acquired all of the outstanding stock of Tuf-Nut (then known as Little Rock Tent & Awning Company) on January 1, 1965, for $2,330,000.72. These stocks were immediately placed in inventory. At the time of purchase the company had made a substantial profit from the manufacture of work clothing and casual wear so that it had cash of $900,917.21 and an earned surplus of $1,619,514.96. Once again taxpayer acquired the shares of stock with the intent of declaring a substantial dividend to itself to bring down the equity of the company. Taxpayer also planned here to recapitalize the corporation and borrow money so that the company's annual earnings of $100,000 would have a more favorable relationship to its capital. This, it was thought, would make a more attractive investment for buyers.

Eight days after purchase taxpayer caused this corporation to declare a dividend of $800,000. Thereafter, the corporation was recapitalized with two classes of stock, its name was changed to Tuf-Nut Company, and then additional dividends of $900,000 cash and real estate with a book value of $85,040.21 were distributed to taxpayer. With the equity of the corporation so reduced, Stephens then began a program of merchandising this restructured company. However, it did not offer these stocks for sale to its regular customers as they might appear, but rather, taxpayer set out to find a purchaser who was already in the clothing industry. Ultimately in July of 1965 the company was sold to Key Work Clothes Company for approximately $600,000.

For its taxable year ending May 31, 1965, taxpayer filed a consolidated return with Tuf-Nut which enabled it to eliminate from the reported income 100% of the dividends that were received. On that same return taxpayer claimed an inventory adjustment of $1,647,000.72 to reflect the decline in market value of the Tuf-Nut shares which occurred by reason of the payment of these dividends.

We think it clear that taxpayer was not acting as a "dealer" within the mean-

---

6. The taxpayer contends that its purpose throughout was to resell this stock and to "accommodate" the purchasers by reducing the resale price through the declaration of a dividend and by arranging a loan to enable them to pay the balance.

The taxpayer claims that these purchasers were unable to acquire the corporation outright because of their financial circumstances. Thus, it is claimed, Stephens was providing a dealer service in this transaction.

ing of the regulation in either of these instances.

The record demonstrates in both cases that the economic gain which taxpayer planned to derive included the receipt of the dividend income. At the time taxpayer purchased these companies it fully contemplated that it would not make its profit from a resale at a price above the original acquisition cost or from a dealer commission. Its plan was admittedly to remove the excess surplus of each company by means of the dividend, with the result that a *smaller* per share price could be charged on resale which, *when combined with the dividend,* would exceed the original outlay that it had made for these stocks. In the case of Schevenell this amounted to a profit of $2,084.91 since taxpayer received a dividend of $190,000 and a resale price of $182,000 in return for its original investment of $369,915.09. With Tuf-Nut, taxpayer received a total of $2,385,040.21, when the dividends and resale price are combined, in return for its original investment of $2,330,000.72. In each instance no profit would have resulted without reaping the largely nontaxable extraordinary dividend as part of the expected gain. This is not the type of profit a "dealer" seeks. As Brown v. United States, supra, 426 F.2d at 364, points out, the goal of the dealer is to make a profit "on the price of the security itself" or by acting "in the traditional manner" as a middleman seeking a "commission" or "some other dealer concession." All of these aspects are lacking here.

We think it clear that the intended dealer's profit must accrue strictly from the sale of the security itself and cannot be planned to arise from the necessity of combining the investment income yielded by the security and the ultimate resale price. It may be true that a dealer will incidentally profit by the income earned by a security during the "carry" period, but in a true "dealer" situation this profit is not sought or planned for as a partial remuneration of his original outlay. Thus, we hold

that taxpayer's scheme in each of these instances of recovering a profit on his original investment through the combined return of both dividends and resale price excludes him from the "dealer" classification with regard to these shares. Moreover, taxpayer's methods of merchandising these stocks were more in the nature of promoting an operating business than handling these securities, *as securities.* This factor, too, bolsters our determination that taxpayer was not acting as a "dealer" in either of these instances. As a result, we hold that the loss which occurred on the resale of Schevenell shares must be treated as a capital loss and the inventory adjustment claimed on the Tuf-Nut stock is not allowable.

## STEPHENS FINANCE COMPANY

In 1952 taxpayer and a partner, T. J. Raney & Sons, formed the El Dorado Water Company by transferring certain water utility assets into the corporation in return for common and preferred stocks which each held in equal amounts. Taxpayer and Raney then jointly operated the water company until 1959 when taxpayer acquired all of the outstanding shares. From the time the business was incorporated taxpayer held its shares in inventory. The preferred stock was sold, although it was later reacquired in 1959. Taxpayer, however, sold none of the common shares. The record shows that no sales of this stock occurred because taxpayer refused to sell at the normal dealer markup and instead sought to double its investment upon resale. In 1959, after taxpayer gained complete control of this corporation, it sold all of the water utility assets to the City of El Dorado for a profit of $737,672.44. The name of the corporation was then changed to Stephens Finance Company and the company entered into the business of lending money. There is no evidence that the stock of this company was offered to customers at any time after taxpayer gained control.

On January 1, 1960 and May 31, 1960, taxpayer caused Stephens Finance Com-

pany to pay it dividends totalling $704,-375.81 which it reported on its 1960 tax return as dividend income subject to a dividend received deduction of $598,719.-44. On this same return taxpayer claimed an inventory adjustment of $462,500 to reflect the decreased market value of this stock after the payment of the dividend. The government challenges this latter deduction.

The district court held that taxpayer was not a "dealer" with respect to this stock since the corporation was not formed for the purpose of resale. Taxpayer appeals contending that the stock was held for resale as is evidenced by its placing these shares in its inventory rather than in its investment portfolio. Taxpayer contends that there are only two methods by which stock can be handled by a dealer. If the stock is to be treated as held for investment purposes then it must be segregated and clearly identified as such as Section 1236 requires. All other stock, taxpayer contends, automatically becomes a part of merchandise inventory.

We agree with the trial court that the facts here clearly show that taxpayer did not handle this stock as a "dealer." The failure to designate a security as held for investment does not provide a conclusive result that it is a proper item of inventory. As the Tax Court points out in Stern Brothers & Company, 16 T.C. 295, 315 (1951):

"The fact that a particular security is carried in general inventory alongside securities which are a part of the dealer business does not exclude the possibility that it was acquired and is held for investment and constitutes a capital asset."

The dictates of Section 1236 have been explained by the Court of Claims as follows:

"Section 1236 of the Code, which plaintiffs invoke because these bonds were not 'clearly identified' on [its] records as securities held for investment, was obviously designed for the Service's benefit, to protect the reve-nue against the indiscriminate use of certain preferential Code provisions; the section should not be turned on its head so as to allow taxpayers to take advantage of still other preferential provisions by invoking their own failure to designate the securities for investment as conclusive that the bonds were held primarily for sale." Brown v. United States, supra, 426 F.2d at 356–357.

A taxpayer cannot control the ultimate determination of whether or not he holds a security for investment purposes by his own designation or lack thereof under Section 1236. That section may deny preferential treatment to true investment securities which are not designated as such, but it cannot accord other preferential treatment to such shares by failure to comply with its dictates.

## PUBLIC UTILITIES COMPANY OF CROSSETT, ARKANSAS

The transactions relating to the last corporation raise two separate issues: (1) Whether taxpayer was a "dealer in securities" with respect to this stock so that it was properly entitled to value the stock at the lower of cost or market in its closing inventory for fiscal 1963, and (2) whether the liquidation of this corporation and subsequent transfer of its assets to two newly incorporated entities in fiscal 1964 was a taxable liquidation under § 331(a) of the Internal Revenue Code or a tax-free reorganization under § 368(a) (1) and § 355 of the Internal Revenue Code. The resolution of the first issue necessarily affects the adjusted basis of this stock which must be taken into consideration in determining the ultimate gain or loss realized on the disposition of this stock whether by taxable liquidation or by sale following a tax free reorganization in fiscal 1964.

On March 28, 1963, taxpayer and two other corporations entered into a stock purchase agreement agreeing to pay $311 per share for the controlling interest in the Public Utilities Company of Crossett. As a result of this agreement taxpayer

acquired 50% of this stock for $1,087,-722.50, and immediately placed these shares in inventory. Vernon Giss, one of taxpayer's officers, testified that the company was advised by its legal counsel that unless it obtained an exemption from the Securities and Exchange Commission from the provisions of the Public Utilities Holding Act it could be declared at any time a Public Utility Holding Company. This, he explained, would not interfere with taxpayer's business of buying and selling securities, but any further financing operations carried on by the company would have to be approved by the Commission. Thereafter, Mr. Giss testified, the Director of the Public Utility Section of the S.E.C. advised them that if they intended to only temporarily hold the stock and to dispose of it within a reasonable time, they would not be in violation of the Act. Although no specific time period for exemption was set out and no written exemption obtained, taxpayer decided to sell this stock by December of 1963 in order to escape the consequence of being found a Public Utility Holding Corporation.

On cross-examination Mr. Giss testified that the utility company was acquired with the intent and purpose of declaring a dividend in order to provide cash to pay the purchase price. On May 29, 1963, a dividend of $111 per share was declared which netted taxpayer $388,222.50. This amount was reported as dividend income on taxpayer's fiscal 1963 return subject to a dividend received deduction of $329,989.13. The usual corresponding inventory adjustment was made, giving taxpayer a deduction of $388,222.50 to reflect the decrease in market value of this stock after payment of the dividend.

The Public Utilities Company of Crossett provided the electric, telephone, natural gas and water services to the City of Crossett. After it was announced that taxpayer had been the successful bidder in acquiring this company, a number of unsuccessful bidders approached taxpayer seeking to buy this stock. Taxpayer, however, made no sale. The testimony of Vernon Giss indicates that from the outset taxpayer acquired this corporation with the purpose of reorganizing it and improving its potential profit on resale.

Before discussing in detail the procedures followed in restructuring this company, the issue of whether or not taxpayer was a dealer with respect to this stock should be resolved here. If taxpayer was a "dealer" the government concedes there is no further purpose in determining the tax consequences of the later liquidation and reincorporation.[7]

Upon audit of the 1963 return the Internal Revenue concluded that taxpayer could not claim dealer status with respect to this stock and thus was not entitled to reduce its ending 1963 inventory by the amount of decline in the market value of this stock. At the time of the audit taxpayer paid the resulting deficiency and did not file claim for refund to challenge this determination. The statute of limitations now bars any refund of 1963 income tax. However, unlike the situation dealing with the Hollis stock (n. 5 supra), the question of the propriety of the government's audit adjustment is reviewable here since this determination will affect the amount of the refund claimed in the 1964 year.

▆▆▆ The trial court found that taxpayer was a "dealer in securities" with respect to this stock. This holding was apparently on the ground that taxpayer acquired the stock with the intent to resell it. We again disagree. Viewing the transaction as a whole, the record establishes that taxpayer acquired this cor-

7. Approval of the inventory write-down deduction would result in a lower cost basis for this stock. Thus, when using this lesser amount to determine the gain or loss on either the liquidation or the late sale of the shares of the transferee corporation, a gain would result in each instance. The government concedes that it would make no difference whether this gain is taxed at the time of liquidation or at the time of the late sale.

poration with the intent to break it up into separate more salable units after drawing off as much cash as possible via the dividend route. The record fails to show that the taxpayer here acquired these shares for the immediate purpose of creating "a stock of securities to take care of future buying orders in excess of selling orders." Schafer v. Helvering, supra. To the contrary, taxpayer (without explanation in this record) turned away several prospective purchasers immediately after it acquired these shares. Thus, we conclude that even though taxpayer acquired this stock with the expectation that it would ultimately dispose of it before the S.E.C. took action, the underlying purpose of the acquisition was to restructure the organization so as to obtain a profit from the increased market value of the planned separate units as existing operating businesses. As explained in our discussion of Schevenell and Tuf-Nut, supra, this technique of improving the salability of a stock by acquiring control of a corporation, entering into the management and operations of its business, and reorganizing the capital structure of the entity is totally outside the traditional scope of a "dealer's" activities. Cf. George R. Kemon, 16 T.C. 1026, 1029, 1033 (1951). As such, we hold the ultimate resale motive which is the basis of the trial court's holding is insufficient to support the court's determination that taxpayer is a "dealer in securities."

Our determination that taxpayer was not a "dealer" in the stocks of the Public Utilities Company requires us to now meet the next issue—whether the liquidation of this company and subsequent reincorporation of its assets and liabilities into two new structures was a tax-able liquidation or a tax free reorganization. The trial court held that it was a tax free reorganization rejecting the taxpayer's claim that it creates an allowable deduction in fiscal 1964.[8] If the government is correct, then this loss is not recognized, and, instead, the taxpayer's original high cost basis for this stock carries over and becomes the basis of the new stock.[9] See Section 358(a), Internal Revenue Code of 1954. Ultimately these latter shares were sold by taxpayer to its own controlling shareholders. The parties have stipulated that if any loss resulted from this sale, such loss would not be allowed by reason of Section 267 of the Internal Revenue Code.

We turn to the facts.

On November 5, 1963, taxpayer and the other two corporate stockholders, at a joint special meeting of stockholders and directors, adopted a plan of liquidation and dissolution. Under the arrangement Public Utilities Company's assets and liabilities were to be transferred to a trustee, the corporation was then to be liquidated and the trustee was then to transfer these assets subject to their liabilities to two newly formed corporations. The stock of the new corporations was to be received by the trustee in exchange and distributed pro rata among the former shareholders of Public Utilities Company. All this was to be accomplished without any interruption of service to Public Utilities Company's customers. Pursuant to this plan, an application "for approval of a plan of reorganization" was submitted to the Arkansas Public Service Commission, the details of which are set out in the district court's opinion. 321 F.Supp. at 1167. Thereafter, on November 29, 1963, Public Utilities Company was dis-

---

8. The taxpayer had originally reported a gain from this transaction. Of course, this gain was computed by taking into account the reduction in basis which occurred by reason of the 1963 inventory write-down deduction. Our denial of this write-down deduction causes this stock to retain its original high cost basis, and since this basis exceeds the amount taxpayer received in exchange at the time of the liquidation, a loss results from this transaction.

9. Another result which would ensue if this is a tax free reorganization, is that the adjusted basis of Public Utilities Company's operating assets would carry over and become the basis of those assets in the hands of the two newly formed corporations. At oral argument the parties indicated that litigation is presently pending before the Tax Court which concerns the proper basis to be used in determining the gain or loss which resulted when these assets were sold in subsequent years.

solved, and its assets, subject to liabilities, were transferred to a trustee. The trustee, in turn, transferred the water service assets subject to their related liabilities to Crossett Water Company [hereinafter "Water"] in exchange for its stock. The balance of the assets and related liabilities were transferred to Public Utilities Corporation [hereinafter "Corporation"] in exchange for its stock.[10]

After taxpayer and the two other corporate shareholders of Public Utilities Company received a pro rata share of the stock of these two new corporations, but before December 31, 1963, each disposed of its shares so that as of that date no one who was a shareholder before the liquidation-reincorporation held stock in the two new entities. Taxpayer disposed of its shares by selling them to its two controlling shareholders, W. R. Stephens and Jack Stephens, for $603,401.95. As stated previously, whether this sale resulted in a taxable gain or a non-deductible loss is a question directly related to our determination of the proper tax treatment to be given to the liquidation-reincorporation.

Taxpayer has pointed out that it had three business reasons for effecting the above transactions: (1) It wanted a higher cost basis for the assets of Public Utilities Company for tax purposes which it intended to acquire by means of a taxable liquidation; (2) it wanted to separate the assets of the water service from the other utilities since public agitation in the City of Crossett made it appear that the city might forcibly take over the water operations by condemnation; and (3) the water service was not operating at a profit. It was felt that operating the water service as a separate corporation would point up its losses and demonstrate to the Arkansas Public Service Commission the real need for a rate increase. The government does not dispute the fact that taxpayer had valid business reasons for these structural changes.

It is the position of the government that these changes resulted only in a "split-up" of Public Utilities Company which is a form of tax free reorganization included within Section 368(a) (1) (D).[11] That section defines a reorganization as follows:

"[A] transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more

---

10. On December 24, 1963, the outstanding shares of the Water Company were exchanged for shares of the Public Utilities Corporation so that the Water Company became a wholly owned subsidiary of Public Utilities Corporation and all former Water Company shareholders thereafter held Corporation stock only.

11. The trial court found that there was a tax free reorganization "falling within the terms of at least section 368(a) (1) (F)." The government strongly urges that the transaction comes exclusively within subsection "D" and not "F" as the lower court found. Although the taxpayer contends that this was not a tax free reorganization at all, at oral argument it conceded that this could not be a "F" type reorganization because of its divisive nature.

We note that the courts are divided on the question of whether a reorganization which qualifies under "D" can also qualify under "F". See Estate of Stauffer v. Commissioner of Internal Revenue, 403 F.2d 611, 617–619 (9 Cir. 1968), and Davant v. Commissioner of Internal Rev-

enue, 366 F.2d 874, 884 (5 Cir. 1966), cert. denied, 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460 (1967) finding that both "D" and "F" may apply. Compare Gordon v. Commissioner of Internal Revenue, 424 F.2d 378, 383–385 (2 Cir. 1970); Baan v. Commissioner of Internal Revenue, 450 F.2d 198 (9 Cir. 1971). And see Columbia Gas of Maryland, Inc. v. United States, 366 F.2d 991, 995–996, 177 Ct.Cl. 97 (1966) holding that Congress' use of the word "mere" in "F" was meant to exclude from the scope of that section any "fractionation of a business into different corporate entities."

Although we find here that the liquidation of Public Utilities Company and subsequent reincorporation of its assets qualifies as a "D" reorganization, we do not find it necessary to reach the question of whether this necessarily prevented it from also qualifying under "F". There is no issue in this case which requires such a determination and we need not speculate as to the effect such a determination would have on the litigation presently pending in the Tax Court.

of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356." [12]

The government further points out that the transactions here qualify under Section 355 because that section governs divisive transactions wherein a single corporation splits up into two or more corporations each owned directly by the former shareholders of the single corporation. See Commissioner of·Internal Revenue v. Baan, 382 F.2d 485, 491 (9 Cir. 1967), aff'd 391 U.S. 83, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968). See also, Mintz, Divisive Corporate Reorganizations: Split-Ups and Split-Offs, 6 Tax L.Rev. 365 (1951). Pointing to the "continuance of the proprietary interests in a continuing enterprise" which is one of the indicia of a reorganization that a true liquidation lacks (see Lewis v. Commissioner of Internal Revenue, 176 F.2d 646, 648 (1 Cir. 1949) the government claims that taxpayer here merely reorganized Public Utilities Company by splitting it into two continuing corporate entities.

The taxpayer objects to this characterization and strongly contends that this transaction, when viewed as a whole, can only be labeled a taxable liquidation under § 331 I.R.C. It is the taxpayer's position that this entire transaction involved a series of steps each of which was interrelated and the last of which called for taxpayer and the other two corporate shareholders to divest themselves of their shares in the newly formed corporations. Thus, the taxpayer contends, when this last step is considered as part of the overall "plan," the requirement of § 368(a) (1) (D) that "immediately after the transfer the transferor, or one or more of its shareholders" be in "control" of the corporations to which the assets are transferred is absent. It is taxpayer's contention it served only as a "conduit" through which the shares of the new corporation were funneled to their new owners and therefore § 368 has no application.

■ The question thus becomes whether taxpayer's sale of the shares which it received in the newly incorporated corporations was a part of the plan of reorganization or whether it was a separate independent transaction. The trial court held that taxpayer failed to sustain its burden of proof with regard to this issue. 321 F.Supp. at 1167 and 1169. We sustain this finding as being supported both in law and fact.

■ We recognize that for income tax purposes "the component steps of a single transaction cannot be treated separately" (Bassick v. Commissioner of Internal Revenue, 85 F.2d 8, 10 (2 Cir. 1936), cert. denied, 299 U.S. 592, 57 S.Ct. 120, 81 L.Ed. 436) and that "the question of control is to be determined by the situation existing at the time of the completion of the plan rather than at the time of the fulfillment of one of the intermediate steps." Case v. Commissioner of Internal Revenue, 103 F.2d 283, 286 (9 Cir. 1939). See also Barker v. United States, 200 F.2d 223, 231 (9 Cir. 1953); Ahles Realty Corp. v. Commissioner of Internal Revenue, 71 F.2d 150 (2 Cir. 1934); West Texas Refining & Development Co. v. Commissioner of Internal Revenue, 68 F.2d 77 (10 Cir. 1933); Prairie Oil & Gas Co. v. Motter, 66 F.2d 309, 311 (10 Cir. 1933); and United Light & Power Co., 38 B.T.A.

12. For purposes of this section "control" is defined to mean "ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation." Section 368(c). The stock attribution rules of Section 318 are not applicable in determining control for purposes of corporate reorganizations. See Hyman H. Berghash, 43 T.C. 743, 757 (1965).

477, 485 (1938). However, we also recognize that:

"[It]. is not essential that the stockholders should have retained their interest or control for any length of time; it is sufficient that they were momentarily in control at the required time, provided that is, that they are not under any contract or plan to give up that control to others." Mertens, 3 Law of Federal Income Taxation § 20.91, Ch. 20 p. 423 (Zimet Rev.1965). See also Evans Products Co., 29 B.T.A. 992 (1934); Federal Grain Corp., 18 B.T.A. 242 (1929).

Consequently, we must examine the situation as it existed immediately after the transferor corporation [PUC] was liquidated and the shares of the two new corporations were received by taxpayer. It is well settled that if taxpayer was obligated by a pre-existing contract or plan to divest itself immediately of these shares, it did not enjoy the substantial rights of legal and equitable ownership which are necessary to a determination that it was in "control" of the transferee corporations "immediately after" receiving their shares. See, e. g., Bassick v. Commissioner of Internal Revenue, supra; Hazeltine Corp. v. Commissioner of Internal Revenue, 89 F.2d 513 (3 Cir. 1937); Herberlein Patent Corp. v. Commissioner of Internal Revenue, 105 F.2d 965 (2 Cir. 1939); holding that a pre-existing contract requiring immediate sale of the shares of the transferee corporation prevented a tax free reorganization. See also Rinkel v. Knox, 196 F.Supp. 21 (D.Minn.1961), finding the subsequent divestment a necessary part of the "plan" of reorganization. By contrast, it has been held that if the recipient was not *obligated* to make a transfer of the transferee corporation's shares, any subsequent sale of these shares even though intended from the very outset of the reorganization would have no effect on the determina-

tion that he was in control of the transferee "immediately after" he received its shares. See, e. g., C. T. Inv. Co. v. Commissioner of Internal Revenue, 88 F.2d 582 (8 Cir. 1937); Wilgard Realty Co. v. Commissioner of Internal Revenue,[13] 127 F.2d 514 (2 Cir. 1942), cert. denied, 317 U.S. 655, 63 S.Ct. 52, 87 L.Ed. 527; American Compress & Warehouse Co. v. Bender, 70 F.2d 655 (5 Cir. 1934), cert. denied, 293 U.S. 607, 55 S.Ct. 123, 79 L.Ed. 698; Federal Grain Corp., 18 B.T.A. 242 (1929). We agree with the analysis of the Ninth Circuit when it observed:

"The statute is obviously intended to reach those cases where *unfettered substantial control* of a corporation survives a reorganization, regardless of subsequent disposition of that control." Commissioner of Internal Revenue v. Schumacher Wall Board Corp., 93 F.2d 79, 81 (9 Cir. 1937). (Emphasis ours.)

The taxpayer here admits that its ownership of the shares of the transferee corporations was not "fettered" by a pre-existing contract binding it to sell these shares to its two stockholders immediately after the reorganization. However, taxpayer would have us find that its plan of reorganization necessarily included as an integral part the final sale of these shares to its shareholders. In support of this argument taxpayer points to the potential threat of the S.E.C. that it would be declared a Public Utility Holding Company if it held on to these shares too long.

In deciding the question of whether or not the ultimate sale which did occur was a part of the taxpayer's plan of reorganization, we find helpful these remarks of the Tax Court dealing with a tax free incorporation:

"In determining whether a series of steps are to be treated as a single indivisible transaction or should retain their separate entity, the courts use a

13. The *Wilgard* decision dealt with the question of whether the necessary "control" existed to create a tax free incorporation. The similarities which exist in finding control in reorganizations and incorporations make decisions dealing with the latter question relevant here.

variety of tests. . . . Among the factors considered are the intent of the parties, the time-element, and the pragmatic test of the ultimate result. An important test is that of mutual interdependence. Were the steps so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series?" American Bantam Car Co., 11 T.C. 397, 405 (1948). According to the tests set out by that court, the later sale must be an "integral" part of the plan, a "sine qua non" without which no other step would have been taken. 11 T.C. at 406. If the sale, though contemplated from the outset of the reorganization, is merely "secondary and supplemental to the principal goal of the plan," it cannot be said to place such an *obligation* upon the taxpayer to give up his shares as would divest it of the "control" indicative of a tax free reorganization. In other words, such a step lacks the "mutual interdependence" which is required to make it an "integral" part of the plan. See also, Rabkin & Johnson, 3 Federal Income, Gift and Estate Taxation, § 32.08A(2)–(6).

Viewing the facts of the instant case in this light, we find ample support for the trial court's finding that the ultimate sale which taxpayer did make of the shares of the transferee corporations was not an integral part of its plan of reorganization. First, we note that the written plan which was submitted to the Arkansas Public Service Commission contained no reference to a step requiring the ultimate disposal of these shares. In addition, we observe that taxpayer did not contractually bind itself to sell these shares to its shareholders or anyone else. And further, any intent which taxpayer did foster to ultimately sell these shares

drew its impetus from the external threat of a potential S.E.C. ruling and was not based upon some intrinsic need of the reorganization scheme. It is clear that taxpayer's purpose for splitting-up Public Utilities Company into two separate corporations related solely to its desire to make the water utility an independent operating entity. Whether the taxpayer or a third party held these shares thereafter was not an important consideration integrally related to the decision to so restructure these assets. Certainly, it cannot be said that the sale which did occur was a step "without which no other step would have been taken." Viewing the transaction from either side, had taxpayer chosen (as it could have) not to sell these shares, the valid business reasons discussed above would no doubt have prompted it to carry out the same reorganization. And conversely, had taxpayer chosen not to reorganize the Public Utilities Company corporation, it would still have had to face the question of whether to sell the stock or retain it and be declared a Public Utility Holding Company. In either instance, the contemplated sale does not play an integral role *in the plan of reorganization.* Thus, we view the sales which did occur as merely "secondary and supplemental to the principal goal of the plan." 11 T.C. at 406.

We hold that taxpayer had the necessary "control" immediately after the liquidation of Public Utilities Company and the receipt of the shares of the two newly formed corporations to cause this transaction to qualify as a tax free reorganization under § 368(a) (1) (D). Thus, we affirm the lower court's finding that this was a tax free reorganization and not a taxable liquidation.[14]

14. We find no merit in taxpayer's further argument that because Public Utilities Company was liquidated before the incorporation of Water and Corporation, it cannot be found that Public Utilities Company had itself transferred its assets and thereby gained control of these two new corporations, and that consequently Public Utilities Company's shareholders (including taxpayer) cannot be said to have control. The fact that a liquidating trustee was used as a conduit does not change the result. Mertens states:
"Liquidation of the transferor after transfer of the assets does not prevent the transaction from being a reorganization. The requirement of a transfer by a corporation is satisfied where such

Judgment reversed and remanded in No. 71–1571 with directions to enter judgment in favor of the United States of America; the cross-appeal of the taxpayer in No. 71–1586 is ordered dismissed.

transfer is made by the liquidating directors of the transferor corporation, or some intermediary acting on behalf of the transferor." Mertens, supra, § 20.91, Ch. 20 p. 411.
See also Reef Corporation v. Commissioner of Internal Revenue, 368 F.2d 125 (5 Cir. 1966), cert. denied, 386 U.S. 1018, 87 S.Ct. 1371, 18 L.Ed.2d 454 (1967) ;

Davant v. Commissioner of Internal Revenue, 366 F.2d 874 (5 Cir. 1966), cert. denied, 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460 (1967) ; Pebble Springs Distilling Co. v. Commissioner of Internal Revenue, 231 F.2d 288 (7 Cir. 1956), cert. denied, 352 U.S. 836, 77 S.Ct. 56, 1 L.Ed.2d 55.